[No. 9730–7–III.   Division Three.   May 17, 1990.]

ODESSA SCHOOL DISTRICT NO. 105, ET AL, *Respondents,* v.
INSURANCE COMPANY OF AMERICA, *Petitioner.*

*Allan Baris, Michael Farrell,* and *Merrick, Hofstedt & Lindsey,* for petitioner.

*Roland L. Skala* and *Weeks & Skala; Mark S. Northcraft, Lisa Pan,* and *Bassett & Morrison, P.S.;* and *Jay Leipham* and *Underwood, Campbell, Brock & Cerutti, P.S.,* for respondents.

MUNSON, C.J.—Insurance Company of America (INA) seeks discretionary review of the partial granting of summary judgment in favor of Odessa School District and Industrial Indemnity Company (IIC), contending the court erred in (1) finding an injured student's claim was covered by the INA policy; and (2) the INA policy provided coverage ahead of the IIC policy.

On May 20, 1986, the Odessa High School track team met in the school parking lot, following a regularly scheduled practice, for an end–of–the–year pizza party.[1] The team ceased practice early and began their trek in private cars to a Moses Lake pizza parlor. The team outing, planned in advance and partially financed through a school bake sale, was undertaken with the knowledge and approval of the school principal. Rae Lynn Weber, a member of the Odessa track team, was a passenger in a van owned by the head coach, Russell Read, and driven by the assistant coach, his wife. En route, the van was struck by a fertilizer truck which failed to stop at an intersection. Ms. Weber sustained serious injuries, which included permanent paralysis of her lower extremities and partial paralysis of her upper body. She commenced a personal injury action naming as defendants, among others, the tortfeasor, Odessa School District and IIC, an insurer of the School District.[2]

---

[1]The regular season had drawn to a close following this practice, except for those athletes participating in postseason track meets at the district and state levels.

[2]The School District's insurance protection plan was composed of three policies provided by different companies and a self–insurance program with a $25,000 limit. INA underwrote a $5 million liability policy covering catastrophically

During a jury trial, the parties settled with Ms. Weber for an amount the court approved on May 18, 1988. The jury was asked to decide the comparative negligence of each party. It found the tortfeasor was 90 percent liable and the School District 10 percent liable. The School District and IIC contributed toward the damages and costs of the Weber claim pursuant to the jury's allocation of liability.[3]

INA had previously denied coverage for the Weber claim and declined to contribute to the settlement and litigation costs. IIC brought a declaratory judgment action to determine the extent of coverage, if any, of INA for Ms. Weber's injuries. INA again denied coverage. On February 23, 1988, the court granted IIC a partial summary judgment on the issue of coverage, holding the Weber loss was within the INA policy. On December 6, the court granted a second summary judgment as to priority, holding INA's policy provided coverage before the IIC policy; this entitled IIC to reimbursement for the amounts it had expended in settlement and defense of the underlying claim based on its portion of the overall settlement. INA appeals both summary judgment orders.

First, INA argues several contentions that the court erred in finding its policy covered Ms. Weber's claim, as a matter of law.

In reviewing a summary judgment motion, the appellate court is in the same position as the trial court, considering all the evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Central Wash. Bank v. Mendelson–Zeller, Inc.,* 113 Wn.2d 346, 351, 779 P.2d 697 (1989). Summary judgment is appropriate only when the pleadings, depositions, admissions, and affidavits demonstrate that no genuine issue as

injured students engaged in extracurricular activities. IIC provided a $1 million comprehensive liability policy for losses exceeding the self–insurance limit. Industrial Underwriters Insurance Company (IUI) provided a $5 million comprehensive liability policy limited to excess coverage (umbrella policy). The IUI policy specifically excluded injuries occurring in athletic events or practices.

[3]This amount included IIC's payment toward the settlement, the School District's $25,000 self–insured retention, and attorney fees and costs for its defense.

to any material fact exists as a matter of law. CR 56(c); *Mendelson–Zeller,* at 351.

In Washington, insurance policies are construed as contracts, and interpretation of policies is a matter of law. *State Farm Gen. Ins. Co. v. Emerson,* 102 Wn.2d 477, 480, 687 P.2d 1139 (1984). A policy is to be given a fair, reasonable, and sensible construction that comports with how it would be viewed by an average purchaser of insurance. *Grange Ins. Co. v. Brosseau,* 113 Wn.2d 91, 95, 776 P.2d 123 (1989). Insurance clauses are to be liberally construed to provide coverage whenever possible. *Riley v. Viking Ins. Co.,* 46 Wn. App. 828, 733 P.2d 556, *review denied,* 108 Wn.2d 1015 (1987). If a provision is ambiguous on its face, *i.e.,* susceptible to two different but reasonable interpretations, the court must attempt to discern and enforce the contract as the parties intended. *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.,* 111 Wn.2d 452, 456–57, 760 P.2d 337 (1988). In resolving the ambiguity, the court looks to the policy as a whole, the subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of the interpretations. *Transcontinental,* at 457. Any remaining ambiguity must be given a meaning and construction most favorable to the insured. *Transcontinental,* at 457; *Stanley v. Safeco Ins. Co. of Am.,* 109 Wn.2d 738, 741, 747 P.2d 1091 (1988).

Affidavits by INA establish its insurance policy was developed at the national level and offered through the various state school athletic associations, here, the Washington Interscholastic Activities Association (WIAA),[4] to member school districts. The School District's authority to delegate control functions to the WIAA is found in RCW 28A.58.125, which provides in relevant part:

> Each school district board of directors is hereby granted and shall exercise the authority to control, supervise and regulate

---

[4]In June 1985, the Odessa School District delegated to the WIAA "the authority to control, supervise and regulate interschool activities consistent with the statutes and rules and regulations governing school districts in this state and consistent with the rules and regulations of the WIAA."

the conduct of interschool athletic activities and other inter-school extracurricular activities of an athletic, cultural, *social or recreational* nature for students of the district. A board of directors *may delegate control, supervision and regulation of any such activity to the Washington Interscholastic Activities Association* or any other voluntary nonprofit entity and compensate such entity for services provided . . ..

(Italics ours).[5] Thus, the WIAA had authority to control the activity in question; coverage was present. The Odessa School District purchased this coverage for the 1985–86 school year and identified track as one of the covered activities.

The general insuring clause of the INA policy, section 2, provides coverage as follows:

1. liability for bodily injury or property damage to [the insured's] students catastrophically injured[6] *while practicing for or participating in activities recognized by, sponsored by or under the rules* of the state high school association, *and* liability for bodily injury or property damage to [the insured's] students catastrophically injured *while traveling directly to or from such regularly scheduled and approved practice session or contest* in a school vehicle operated by a validly licensed driver or *as a group in a private vehicle,* under the supervision of a validly licensed adult driver, *designated by the school or other Covered Person*[7] as school transportation.

(Italics ours.) Based on this provision, coverage is afforded on an alternate basis for an injury occurring: (1) while participating in an "activity", or (2) while in the course of travel to or from a practice or contest.

■ INA first contends the pizza party was not a recognized or sponsored WIAA activity, and thus falls outside of

---

[5]See also Odessa School Board resolution delegating to WIAA "authority to control, supervise and regulate" the district's interschool activities.

[6]The INA policy defines "catastrophic injury" as follows: "[A]ny bodily injury . . . the liability for which is covered by this policy, which produces medical expenses in excess of $25,000."

[7]"Covered person" is defined in the policy as follows: "[T]he school district *and board members,* the *coaches,* athletic director, administrators, other employees and athletic team trainers of said school while acting for the named school and engaged in activities under the jurisdiction of the state high school athletic association." (Italics ours.)

the policy coverage. Initially, it points to the affidavit of Cliff Gillies, the executive director of the WIAA. In his affidavit, Mr. Gillies states Ms. Weber was not engaged in a WIAA activity. This statement is the affiant's conclusion of law; it is improper to consider it in a summary judgment setting. *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 49 Wn. App. 130, 133, 741 P.2d 584 (1987), *aff'd*, 110 Wn.2d 912, 757 P.2d 507 (1988). The court appropriately disregarded Mr. Gillies' conclusory statements in reaching its determination.

Next, INA provides excerpts from the WIAA handbook which defines "practices"[8] and "turnouts",[9] claiming the pizza party does not fall within either definition. It asserts the drafters of the policy intended a narrow meaning for the term "activity". Neither the handbook nor the insurance policy provides a definition for "activities". Mr. Gillies' affidavit does acknowledge end–of–season social gatherings are commonly engaged in by teams throughout the state, a fact we deem was known to the WIAA before and after the drafting of this insurance policy.[10] INA's policy contains no exclusion for the present activity, despite the acknowledgment that this type of activity is common throughout high schools in the state of Washington.

If a term is not defined in the policy, it is to be given its plain, ordinary, and popular meaning as understood by the average purchaser of insurance. *Boeing Co. v. Aetna*

---

[8]The WIAA definition for "practice" is "[r]epeating mental or physical actions for the purpose of learning or acquiring proficiency and skill in some activity." It further provides "[a]ny attempt of a coach of a school team . . . to teach any phase of a game or activity to their squad or have their squad or part of their squad engage in drills under the supervision of that coach, or from directions provided by that coach, is a practice."

[9]The WIAA handbook defines "turnout" as "[a] form of practice in which the team/squad gathers for a practice session, chalk talk or *discussion of past and future plans*." (Italics ours.)

[10]There are numerous activities in connection with athletic programs and events. *See Sherwood v. Moxee Sch. Dist. 90,* 58 Wn.2d 351, 363 P.2d 138 (1961) (initiation ceremony of high school lettermen's society).

*Cas. & Sur. Co.,* 113 Wn.2d 869, 877, 784 P.2d 507 (1990); *O'Neal v. Legg,* 52 Wn. App. 756, 760, 764 P.2d 246 (1988), *review denied,* 112 Wn.2d 1013 (1989).

> In this state, legal technical meanings have never trumped the common perception of the common man. "[T]he proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract" but instead "whether the insurance policy contract would be meaningful to the layman . . .". *Dairyland Ins. Co. v. Ward,* 83 Wn.2d 353, 358, 517 P.2d 966 (1974). "The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense."

*Boeing,* at 881. To determine the ordinary meaning of undefined terms, we look to standard English language dictionaries. *Boeing,* at 877. *Webster's Third New International Dictionary* 22 (1969) defines the term "activity" as "a form of organized, supervised, and often extracurricular recreation (as athletic games, dramatics, or dancing)". The policy covers any activity "recognized by, sponsored by or under the rules of" the WIAA. Thus, there exists evidence, through Mr. Gillies' affidavit, acknowledging a WIAA "recognized" activity here.

Further support for coverage can be found in the WIAA's definition of a "turnout", which the handbook considers a form of practice. The record reflects, and the trial court acknowledged, the morale building factor inherent in the pizza gathering. Although the regular track season was over, a primary purpose for the gathering was to support those athletes competing in postseason track events, *i.e.,* district and state competitions. This activity could be considered a "turnout" under the WIAA definition. Consequently, we decline to follow INA's narrow interpretation of "activities", which would limit the term to actual athletic events or contests. As Ms. Weber was injured while participating in an activity recognized by the WIAA, her injuries are covered under the INA policy.

Additionally, we find coverage under the alternate basis of coverage, *i.e.,* traveling directly to or from a regularly

scheduled practice session or contest. INA asserts the alternate language is more restrictive, and thus precludes a finding of coverage. We disagree. As noted above, a "turnout" is considered a form of "practice" under the WIAA rules, and the activity in question is within the context of a turnout.

INA also contends Ms. Weber was neither riding in school transportation nor was the Read van designated as "school transportation", since the Reads failed to submit a request form for the trip. Under the terms of the policy, this argument is unpersuasive. First, the trip was preapproved by the school principal weeks in advance of the actual outing and the use of private vehicles was authorized. A bake sale had been held to raise funds to support this activity. Second, the depositions of both Mr. and Mrs. Read revealed they did not intend to seek reimbursement for travel costs, which is the purpose for submitting request forms. Third, there is no requirement the authorization be in writing. Fourth, the INA policy includes a "coach" within the definition of "covered person". Thus, under the general insuring clause language of section 2, Mr. Read as coach had the power to designate his private van as "school transportation"; the team was traveling under his direction; and Mrs. Read, an assistant coach, was driving the van.

Last, INA asserts on the issue of coverage that even assuming coverage is available under the general liability language of section 2, the optional coverage of section 3 for lifetime medical and disability benefits is not available. The trial court found coverage under section 3. The pertinent INA policy language reads as follows:

III. Supplemental Payments
Medical, Rehabilitation and Work Loss Payments

In consideration of a waiver or waivers of liability claims for bodily injury against Covered Persons, the Company [INA] will make the following payments without proof of liability:

1. The Company [INA] will pay for the reasonable and necessary medical, rehabilitation and work loss expenses, but not for noneconomic loss, actually incurred by a *student catastrophically injured while participating in activities under the*

*jurisdiction of the state high school association* when by reason of such catastrophic injury the student shall require treatment . . ..

(Italics ours.) INA asserts the alternate coverage is more narrowly written than the general liability provision, in that there exists no coverage for catastrophic injuries sustained by a student while traveling to or from the covered activities, thus Ms. Weber does not qualify for coverage under section 3. We disagree.[11] As noted above, the term "activities" includes the pizza gathering. Participation in that activity began the minute the students entered the cars to travel to their destination. We also find significant the policy's failure to define the term "jurisdiction". Consequently, as noted above, the term must be given its ordinary meaning. *Boeing*, at 877. Under *Webster's Third New International Dictionary* 1227 (1969), "jurisdiction" means "power or right to exercise authority" or within the "sphere of authority." If the WIAA had the *power or right* to exercise authority over year–end activities, *i.e.,* the pizza gathering as an athletic activity, there is nothing in the record to indicate it did exercise such authority.

As a second issue, INA contends the court erred in ruling the INA policy provided coverage ahead of the IIC policy. In reaching its decision as to priority, the court adopted a "specific versus general" test for apportionment. *See, e.g., Berkeley v. Fireman's Fund Ins. Co.*, 407 F. Supp. 960 (W.D. Wash. 1975). Under this test, the court considers which of the two policies providing coverage insures the specific risk of liability involved; the insurer with the more specific risk policy is deemed to have primary coverage and the general or blanket risk insurer has secondary coverage. The rationale behind this analysis is that insurers with

---

[11]We note the following language from the policy's exclusions section supports application of the alternate recovery plan:

Payments under Section III are offered without reference to fault but they are only payable *for losses due to occurrences otherwise covered under Section II.* (Italics ours.) A plain reading of this paragraph would allow coverage under section 3 whenever the student qualifies for coverage under section 2.

specific coverage are better able to evaluate the risk involved than a comprehensive general insurer. *See* 6 J. Appleman, *Insurance Law and Practice* § 3912 (Supp. 1989). We decline to follow the general/specific test prioritization because the primary coverage of the School District's insurance plan is its self–insured retention. Both INA and IIC policies are thus excess policies to this primary coverage.

The IIC policy limits coverage under the comprehensive liability section to excess amounts over the School District's self–insured retention:

> 1. The Company's obligation to pay damages under Coverage A *is limited to payment of that portion of the ultimate net loss resulting from any one occurrence which is in excess of the Self–Insured Retention* set forth in the declarations for Section II.
>
> The Company's duty to investigate, settle and defend claims or suits *applies only when the ultimate net loss for any one occurrence exceeds the Self–Insured Retention.*

(Italics ours.) INA contends this language establishes the primary coverage of IIC following a deduction for the self–insured retention. A deductible, however, is not the same as self–insurance. 8A J. Appleman, § 4912, at 508–09 (1981). In *United States Steel Corp. v. Transport Indem. Co.,* 241 Cal. App. 2d 461, 50 Cal. Rptr. 576, 585 (1966), the court was faced with a similar situation and determined the self–insurance retention constitutes primary coverage whereas the other policies provide excess coverage. Additionally, the IIC policy contains excess language in its "other insurance" clause which specifically provides it is not liable until other insurance covering the same loss has been exhausted. *Progressive Cas. Ins. Co. v. Cameron,* 45 Wn. App. 272, 280, 724 P.2d 1096 (1986) held an "other insurance" clause could constitute an excess coverage clause. The language of the IIC policy, combined with the presence of coverage under the INA policy, is sufficient to establish the excess coverage status of both.

Given the concurrent excess coverage[12] and this court's rejection of the "specific versus general" test, we next determine the correct method of apportionment. Two methods are available. Under the "maximum loss" rule of apportionment, the loss is shared equally among the insurers until the limits of the smaller policy are exhausted; any remaining portion of the loss is to be paid from the larger policy up to its limits or until full compensation for the loss is made. *Mission Ins. Co. v. Allendale Mut. Ins. Co.,* 95 Wn.2d 464, 626 P.2d 505 (1981); *see also Rasmussen v. Allstate Ins. Co.,* 45 Wn. App. 635, 639–40, 726 P.2d 1251 (1986), *review denied,* 107 Wn.2d 1031 (1987); *Mission Ins. Co. v. Guarantee Ins. Co.,* 37 Wn. App. 695, 700–01, 683 P.2d 215 (1984); Survey of Washington Law, *Insurance Law: Apportionment Between Policies,* 17 Gonz. L. Rev. 829, 839 (1982). As applied to the present fact pattern, the maximum loss rule would result in INA and IIC sharing equally in the settlement, since each policy would fully cover the loss.

Under the "policy limit" method of apportionment, there is a proration of coverage based on the maximum coverage of each policy. *See Pacific Indem. Co. v. Federated Am. Ins. Co.,* 82 Wn.2d 412, 415–17, 511 P.2d 56 (1973) (overruled in *Allendale,* at 465). The practical effect of applying this rule would be a five/sixths reimbursement from INA for sums expended by IIC in settlement of the Weber claim, based on INA's $5 million limit and IIC's $1 million limit.

Where the policies each provide for contribution by policy limits, they may be interpreted as consistent and read without conflict. *Mission Ins. Co.,* 37 Wn. App. at 701. The "other insurance" provision of the IIC policy initially provides as follows:

---

[12]The language of the INA policy establishes that it too is an excess coverage barrier when there exists one or more other insurance policies covering the same risk. The "conditions" section of the INA's policy specifically provides its benefits "are in excess of . . . total benefits payable for the same loss under any other liability insurance or self–insurance plan".

> If other valid and collectible insurance is available to the Insured, the coverage afforded hereunder shall be considered as excess insurance and this policy shall not apply until such other insurance has been exhausted.

Although the INA policy does not contain a specifically designated "other insurance" provision, its section 2 "conditions" provision reads in pertinent part:

> 2. Benefits will be paid which are in excess of, but not contribute with, total benefits payable for the same loss under any other liability insurance or self–insurance or self–insurance plan . . ..

At this point both policies initially provide only coverage in excess of the coverage of the other. The IIC policy provides alternative provisions for this retention in the second paragraph of its "other insurance" provision:

> If such other available valid and collectible insurance contains a provision similar to the above, or if it provides for contribution by equal shares, then this policy shall contribute equal amounts with such other insurance until the applicable limit of liability has been exhausted or none of the loss remains, whichever occurs first.

Thus, the IIC policy calls the maximum loss rule into effect when both policies provide only for excess coverage one to the other. The INA policy does not contain the alternative provision for contribution by equal shares contained in the second paragraph of IIC's policy. Therefore, the maximum loss rule is not invoked at this point. The IIC policy provides in the third paragraph of its "other insurance" provision:

> In the event such other insurance does not provide for equal contributions as described above, then this insurance will contribute based on the ratio of the limits of liability of this policy to the total limits of liability of all valid and collectible insurance available to the Insured.

This third paragraph calls the policy limit rule of apportionment into effect.

Since the IIC policy allows for contribution and the INA policy rejects it, the policies contain mutually repugnant provisions. The policy limit method of apportionment cannot be employed. Thus, we hold the maximum loss rule

applies and necessitates reversal on this issue to make the proper computations.

■ Third, INA contends the court erred in awarding IIC a judgment which includes attorney fees. A court's determination of the reasonableness of attorney fees will not be set aside absent a clear abuse of discretion. *Nord v. Eastside Ass'n Ltd.*, 34 Wn. App. 796, 800, 664 P.2d 4, *review denied,* 100 Wn.2d 1014 (1983). An abuse of discretion occurs when it is exercised on untenable grounds or for untenable reasons. *Nord,* at 800.

IIC provided no affidavits from its attorneys specifying and itemizing the numbers of hours expended as to the Weber claim as was done in *Nord.* INA contends the court erred in not ruling on the reasonableness of the fees. IIC argues that INA is estopped from now asserting the unreasonableness of the fees. In its memorandum in opposition to summary judgment, INA failed to raise the issue of the reasonableness of the fees. Since we remand for reapportionment, that issue may be raised again.

We affirm the partial summary judgment regarding coverage under the INA policy. We remand for apportionment between INA and IIC on the covered loss and of IIC's reasonable attorney fees and costs.

THOMPSON and SHIELDS, JJ., concur.

Review granted at 115 Wn.2d 1007 and later dismissed at 115 Wn.2d 1022 (1990).