970 A.2d 1074 (2009)
407 N.J. Super. 287
DEB ASSOCIATES, Plaintiff-Respondent,
v.
GREATER NEW YORK MUTUAL INSURANCE COMPANY, Defendant-Appellant.
No. A-5308-07T3
Superior Court of New Jersey, Appellate Division.
Argued March 23, 2009.
Decided June 1, 2009.
*1075 Allan Maitlin, West Orange, argued the cause for appellant (Sachs, Maitlin, Fleming & Greene, attorneys; Mr. Maitlin, of counsel and on the brief; Christopher Klabonski, on the brief).
Thomas S. Novak, Newark, argued the cause for respondent (Sills Cummis & Gross, attorneys; Mr. Novak, of counsel and on the brief).
Before Judges LISA, REISNER and SAPP-PETERSON.
The opinion of the court was delivered by
REISNER, J.A.D.
This case concerns insurance coverage for costs associated with bringing undamaged portions of a damaged structure up to current construction code standards. Defendant Greater New York Mutual Insurance Company (GNY) appeals from two trial court orders dated May 13, 2008 and May 28, 2008, granting summary judgment to its insured, plaintiff DEB Associates, and awarding damages. We affirm, based on our conclusion that, but for wind damage to the seventh floor of its building (a covered claim), plaintiff would not have been required to bring the wall-to-floor connections in the rest of the building up to current code standards.

I
Plaintiff owns an eight-story office building in Cherry Hill, New Jersey. The building was constructed with a brick façade over cinderblock walls. On December 11, 2003, a windstorm sheared off most of the brick façade, the concrete block perimeter wall, and the windows, on the north side of the building's seventh floor facing Route 38. Debris from the collapse fell onto the parking lot and the adjacent highway.
When local code officials inspected the damaged seventh floor, they discovered that the walls had been secured to the concrete flooring with mortar, but not steel fasteners known as "angle irons." A further inspection revealed that this was the case throughout the entire building, and that the walls were no longer securely attached to the flooring. In fact, the inspectors discovered that they could move the exterior walls outward simply by pushing on them.
These factorsthe collapse of the seventh floor wall, and the unstable condition of the remaining wallsled the municipal code official, Gerry Seneski, to conclude that the building would be unsafe unless brought up to current code standards. On December 12, 2003, Seneski issued a notice of unsafe structure, pursuant to N.J.A.C. 5:23-2.32. He ordered that the building be vacated, and as a condition of re-occupancy, required that the walls on floors two through eight, and the roof, be secured to the structure with angle irons, so as to comply with the then-current State construction code.[1]See N.J.A.C. 5:23-3.14(a)(1) *1076 (adopting International Building Code); International Building Code § 2109.7.2 (2000 ed.) (requiring angle irons); N.J.A.C. 5:23-6.2(f) (renovation subcode grandfathers lawful pre-existing buildings, except for unsafe structures). These repairs, without which the code official would not issue a certificate of occupancy, cost approximately a half-million dollars. While GNY, plaintiff's insurer, agreed to pay for repairs to the seventh floor, it refused to cover the cost of installing angle irons on the second through sixth and eighth floors, and the roof.
The parties' dispute centered on the following provision of the insurance policy:
3. Coverage C-Increased Cost of Construction Coverage
a. If a Covered Cause of Loss occurs to the covered Building property, we will pay for the increased cost to:

(1) Repair or reconstruct damaged portions of that Building property; and/or
(2) Reconstruct or remodel undamaged portions of that Building property whether or not demolition is required;
when the increased cost is a consequence of enforcement of building, zoning or land use ordinance or law.
Based on the undisputed facts, Judge Espinosa found that the "remedial work... was required as a direct result of the collapse of the seventh floor wall." She accepted as fact undisputed evidence that "the repairs to the other floors would not have been required if the seventh floor wall had not collapsed, and also that the angle irons were required as a consequence of the December [11], 2003 partial collapse." And she found no evidence of any pre-existing code violations, prior to the December 11 wind damage. Finding the policy unambiguous, the judge concluded that it provided coverage here.
Before discussing the issues on this appeal, we pause to clarify the scope of those issues. The undisputed legally competent evidence in the record established that the building was constructed between 1970 and 1972, prior to the 1975 adoption of the State Uniform Construction Code Act, N.J.S.A. 52:27D-119 to -141. There is no evidence that any then-applicable construction code required interior building walls to be secured with angle irons. At oral argument before us, GNY abandoned any contention that the building violated code standards when it was constructed. Consequently, this appeal does not implicate a provision of the GNY policy excluding improvements made to correct pre-existing code violations.[2]

II
Our review of the trial court's summary judgment order is plenary, using the same Brill[3] standard employed by the trial judge. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Both sides agree that the material facts were not in dispute. Having reviewed the record, we agree that the case was ripe for summary judgment, and we conclude that Judge Espinosa's decision correctly applied the law to the undisputed facts.
With no citations to the record or to any case law, defendant's Point I contends that its policy only covers costs directly associated with repairing the damaged *1077 portion of a building. Defendant's Point II argues that there is no coverage because "the conditions requiring the repairs did not result from the covered cause of loss (i.e., the subject windstorm...)." In other words, defendant contends that there is an insufficiently direct connection between the wind damage to the seventh floor and the code official's direction that plaintiff make repairs to the other floors of the structure. Defendant analogizes the situation to one in which building inspectors arrive to inspect covered damage and fortuitously "happen" to notice other unrelated code violations or unsafe conditions, which they require the owner to fix. We disagree with all of these contentions.[4]
Both parties agree that when a damaged building must be repaired or reconstructed, it is not unusual for building code officials to require that the work be performed consistent with current construction code standards, which may not have existed when the structure was built. Thus, there is no dispute that the clause in question applies to the increased costs of bringing the damaged portions up to current code standards. See 1-1 Appleman on Insurance 2d § 1.11 (2009) (replacement cost coverage may cause insurer to pay for repairs "required to meet building codes in effect during rebuilding").
The parties also agree that the clause would apply to undamaged portions of the same structure which must be brought up to code in the course of repairing the damaged portion. For example, if a portion of a wall collapses, and as result, code officials require the entire wall to be reconstructed using code-compliant materials, there is coverage.
The parties, however, disagree on whether the clause applies where the damage to one portion of a building causes code officials to require repairs to separate, undamaged portions of the building. GNY contends there is never coverage in this situation. Plaintiff contends that there is always coverage so long as "a covered cause of loss occurs" and the insured incurs "increased cost of construction `as a consequence of' building code enforcement as a result of the covered loss." In the alternative, plaintiff argues that there is coverage here because of the direct connection between the collapse of the seventh floor wall, necessitating the installation of angle irons, and the requirement that angle irons be installed on the remaining walls to prevent them from collapsing.
It is well-established that the coverage sections of an insurance policy are to be liberally construed in favor of the insured, exclusions are to be read narrowly, and ambiguities are to be construed against the insurer. See Proformance Ins. Co. v. Jones, 185 N.J. 406, 415, 887 A.2d 146 (2005); S.T. Hudson Eng'rs, Inc. v. Pa. Nat'l Mut. Cas. Co., 388 N.J.Super. 592, 603-04, 909 A.2d 1156 (App.Div.2006), certif. denied, 189 N.J. 647, 917 A.2d 787 (2007).
Generally, "[w]hen interpreting an insurance policy, courts should give the policy's words `their plain, ordinary meaning.'" If the policy language is clear, the policy should be interpreted as written. If the policy is ambiguous, the policy will be construed in favor of the insured. Because of the complex terminology used in the policy and because the policy is in most cases prepared by the insurance company experts, we recognize that an insurance policy is a "contract [] of adhesion between parties who are not equally situated." As a result, *1078 "courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." "Consistent with that principle, courts also [] endeavor [] to interpret insurance contracts to accord with the objectively reasonable expectations of the insured."
....
Important to our analysis is the principle that exclusions in the insurance policy should be narrowly construed.
[Nav-Its, Inc. v. Selective Ins. Co. of Am., 183 N.J. 110, 118-19, 869 A.2d 929 (2005) (citations omitted).]
In the absence of New Jersey cases on point with the facts of this case, both sides have cited cases from other jurisdictions. GNY relies heavily on Chattanooga Bank Associates v. Fidelity & Deposit Co. of Maryland, 301 F.Supp.2d 774 (E.D.Tenn. 2004). In that case, a bank building was damaged by two fires. When local inspectors came to survey the fire damage, they discovered a host of unrelated building code violations throughout the structure. The bank sought coverage for the cost of repairing those violations.
Under "perils insured against," the insurance policy limited coverage to "direct physical loss of or damage to the property." Id. at 776. The court construed this provision as "limit[ing] the liability of the insurer to only those cases where the loss or damage results from the peril." Id. at 780. However, the policy also provided the following coverage, as quoted in the opinion:
14. Demolition And Increased Cost of Construction
In the event of loss or damage under this coverage part that causes the enforcement of any law or ordinance regulating the construction or repair of damaged facilities, the company shall be liable for:
....
C. Increased cost of repair or reconstruction of the damaged and undamaged facility on the same or another site and limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site....
[Ibid.]
The court rejected plaintiff's argument for coverage under that provision:
The plaintiffs contend that because the inspection was triggered by the fire and resulted in the enforcement of the building code, the fire was the cause of the enforcement of the building code. However, this Court disagrees. Although the violations might have remained undiscovered if not for the fire, the violations in question existed independent of the fire and the fire cannot be said to have "caused" the enforcement of a building code, which was at all times subject to enforcement.
[Ibid.]
Construing the clause concerning "increased cost of repair or reconstruction of the damaged and undamaged facility," the court concluded that "[u]pgrades to undamaged portions of a building simply do not amount to repair or reconstruction." Id. at 780-81. The court summarized its holding as follows:
[T]he mere discovery of a code violation during an inspection after a fire is insufficient to create liability under the policy. The plaintiffs must show at trial that the fire, or the attempts to extinguish it, created the need to repair or reconstruct some portion of the insured property in a manner consistent with current building codes.
[Id. at 781.]
Plaintiff relies on Davidson Hotel Co. v. St. Paul Fire & Marine Insurance Co., 136 F.Supp.2d 901 (W.D.Tenn.2001), in *1079 which the court took a more expansive view of coverage, under a policy with the following provisions as quoted by the court:
J. Demolition and Increased Cost of Construction
In the event of loss or damage under this policy that causes the enforcement of any law or ordinance in effect at the time of covered loss, regulating the construction, repair or use of property, this Company [St. Paul] shall be liable for:
....
3. increased cost of repair or reconstruction of the damaged and undamaged property on the same or another site intended for the same occupancy, and limited to the costs that would have incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site....
[Id. at 910-11.]
In Davidson, a water leak in a hotel led to a thorough inspection by city building inspectors, who "required compliance with numerous building code provisions" discovered during the inspection. Id. at 910. The insured sought coverage for the cost of correcting the violations. The court found coverage:
The language of [the quoted insurance] provision is clear. The provision applies to the "enforcement of any law or ordinance in effect at the time of covered loss." The breadth of the provision is not diminished by any limiting language regarding the "grandfathered" status of code violations, as St. Paul would have the Court hold. The main limitation upon this provision is the causal connection required between the loss and the enforcement. Davidson has shown this causation through deposition testimony of several building officials involved in the inspection process. The testimony makes clear that, in the first place, the inspection occurred only because of the incident giving rise to liability and, secondly, the thoroughness of the inspection was also a result of the incident. The Court finds that the proximate cause of the inspection was the February 16, 1998, event, and therefore, that the plain language of this provision renders St. Paul liable for costs associated with code compliance.
....
[I]f St. Paul wished to avoid liability, it could have done so through the language of the contract.
[Id. at 911.]
Plaintiff also relies on Commonwealth Insurance Co. of America v. Grays Harbor County, 120 Wash.App. 232, 84 P.3d 304 (2004), a case in which the court construed the following insurance provision in the context of earthquake damage to a county courthouse:
12. BUILDING ORDINANCE
In the event of loss or damage under this Policy that causes the enforcement of any law or ordinance regulating the construction or repair of damaged facilities, this Company shall be liable for:
....
C. Increased cost of repair or reconstruction of the damaged and undamaged facility on same or another site and limited to the minimum requirements of such law or ordinance regulating the repair of [sic] reconstruction of the damaged property on the same site....
[Id. at 305.]
While the earthquake damaged certain specified portions of the structure, the local code official required the county to bring the "egress, accessibility, fire alarm, fire protection, ventilation, and seismic systems" up to current code standards as a condition of issuing a permit to repair the *1080 damaged portions of the courthouse. Ibid. The court held that "the alterations are covered if the earthquake damage caused the code enforcement resulting in the alterations." Ibid. However, the court concluded that "an issue of material fact exists as to whether the building official required the upgrades because of the earthquake damage" and remanded for further proceedings on that issue. Ibid.
In approaching the question of causation, the court looked at the policy language through the eyes of the reasonable insured:
Generally, we read insurance policies as the average lay purchaser of insurance would. Here, Commonwealth has complicated the matter by incorporating a lawthe building codeinto its definition of coverage. Thus, Commonwealth's coverage extends to repairs to undamaged parts of a covered building if the repairs result from enforcement of any law or ordinance. If we read the policy as Commonwealth urges, the average purchaser of insurance would probably not understand its coverage without consulting an attorney to analyze the applicable building code sections. And this would largely frustrate the law's intent to encourage insurance companies to plainly write their coverage so laypersons can understand it. If, on the other hand, we adopt the County's position, coverage would be set by whatever the city required without regard to its reasonableness. Thus, if the city required the entire courthouse to be rebuilt as a condition of issuing the permit, coverage would follow. We decline to adopt either position.
... [T]he test is not what the building official reasonably believes the code allows him to do. Nor is it what a lawyer or judge believes the code allows. Rather, the test is what a reasonable lay insurance purchaser would believe the code allows the city to enforce.
[Id. at 307 (citations omitted).]
The court reasoned that "[a] reasonable lay purchaser of insurance would conclude that the building official has authority under [the unsafe structures section of the building code] to require alterations to existing, nonconforming uses that are dangerous to human life." Id. at 308.
In language pertinent to the case before us, the court construed the provisions of the building code concerning unsafe structures as reasonably taking into account the context in which an inspection occurs. That is, a building that did not conform to the current code might be deemed acceptable before a disaster, but be deemed unsafe after the disaster occurs.
[T]he deficiencies in the building may not have been so obvious or immediate as to require building condemnation before the earthquake damage; but they may be sufficiently serious to address as part of major repairs required by the earthquake damage. Moreover, to the extent "unsafe," "hazardous," and "dangerous" can fairly be read in two ways, we must adopt the meaning that favors coverage.
[Id. at 308.]
The court further concluded that if the insurer wanted to provide narrower coverage, it should have drafted clearer policy language:
Finally, Commonwealth drafted the policy language. And they wrote coverage in broad terms, covering reconstruction of undamaged parts of the facility if required by enforcement of a law or ordinance. The phrase "enforcement of any law" focuses not on what the code might legally require but on what the building official requires (enforces).... Commonwealth could have limited coverage to reconstruction legally required by the code, or it could have written other restrictions on coverage *1081 for undamaged parts of the insured building. It did not. Again, to the extent Commonwealth's language is ambiguous, we construe it in favor of coverage.
[Ibid.]
The court therefore concluded that the safety upgrades were covered, "if the County can show the earthquake damage caused the building official to enforce the law requiring the upgrades." Ibid. On that issue the court found a factual dispute as to whether the building official required the upgrades because of the earthquake damage or because of the scope of the county's construction project. Id. at 309.
In a somewhat similar case, Regents of Mercersburg College v. Republic Franklin Insurance Co., 458 F.3d 159 (3d Cir.2006), the court addressed a school dormitory that was damaged by fire. The court construed the following policy language:
1. Coverage ACoverage For Loss to the Undamaged Portion of the Building. If a Covered Cause of Loss occurs to covered Building property[,] ... we will pay for loss to the undamaged portion of the building caused by enforcement of any ordinance or law that: (a) requires demolition of parts of the same property not damaged by a Covered Cause of Loss; (b) regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and (c) is in force at the time of loss.
. . . .
3. Coverage CIncreased Cost of Construction Coverage. If a Covered Cause of Loss occurs to covered Building property[,] ... we will pay for the increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law.
[Id. at 162.]
Finding that the scope of the repairs to the building triggered the requirements of the Americans With Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 to 12213, the court held that the insured was entitled to coverage for ADA-mandated improvements even to undamaged portions of the building, if the requirements were triggered by the repairs. For example, the ADA mandated that reconstructed portions of the building be made barrier-free:
It is clear, then, that to the extent the ADAa law in force at the time of the fire-regulated the alterations to Keil Hall (a public accommodation) after the fire and required the Academy to make paths and travel accessible to the primary-function areas on each floor of Keil Hall, the plain language of the Ordinance and Law Endorsement covers Mercersburg's costs of complying with the ADA.
[Id. at 169.]
However, the court rejected the school's argument that it was entitled to coverage for any contemporaneous improvements it chose to make to the structure that were subject to ADA requirements, regardless of whether those improvements related to the fire damage: "Only when some actual Covered Cause of Loss has caused damage to the building, the repair of which must legally be accompanied by changes to the undamaged portion of the building, can the law or ordinance be said to have caused a `loss.'" Id. at 168 n. 11.
Accordingly, the court concluded that the school was not entitled to coverage for improvements that would comply with the Pennsylvania Handicapped Act (PHA), because the scope of the fire repairs would not trigger the provisions of the PHA: "[The school] was only obligated to pay for further remodeling to undamaged portions of Keil Hall if that remodeling was required by an ordinance or law." Id. at 171. The court also concluded that the need to comply with local building codes, *1082 in itself, would not bring renovations to undamaged portions within the policy's ambit: "Certainly, Mercersburg's discretionary decision to renovate undamaged portions of Keil Hall triggered the application of the building codes as to that renovation, but critically important is that the building codes themselves did not trigger those renovations." Id. at 172.
We find the reasoning of Grays Harbor and Regents persuasive. The cases present a reasonable middle ground between the extreme positions advocated by the parties here. Following Grays Harbor and Regents, we conclude that GNY's proposed construction of its policy language is unduly narrow and inconsistent with what a reasonable insured would expect. On the other hand, we reject plaintiff's argument insofar as it would require coverage with no proximate connection between the damage and the required improvements to the undamaged portions of the structure. See Regents, supra, 458 F.3d at 172; Grays Harbor, supra, 84 P.3d at 307-08; Chattanooga, supra, 301 F.Supp.2d at 780-81.
However, applying persuasive precedent to the facts of this case, we agree with plaintiff that there is a clear causal connection between the collapse of the seventh floor wall and the code official's mandate that plaintiff bring the remaining floors into compliance to prevent them from collapsing. Our courts have adopted the proximate cause test for determining coverage:
Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produced the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss. It is not necessarily the last act in a chain of events which is, therefore, regarded as the proximate cause, but the efficient or predominant cause which sets into motion the chain of events producing the loss. An incidental peril outside the policy, contributing to the risk insured against, will not defeat recovery.... In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.
[Franklin Packaging Co. v. Cal. Union Ins. Co., 171 N.J.Super. 188, 191, 408 A.2d 448 (App.Div.1979), certif. denied, 84 N.J. 434, 420 A.2d 340 (1980) (emphasis omitted) (quoting 5 Appleman on Insurance § 3083, at 309-11 (1970)).]
See also Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 256-57, 854 A.2d 378 (2004).
We need not decide here the precise outer reaches of coverage under the clause at issue. Unlike Davidson, supra, this was not a case in which the local inspector happened to be in the building because of the wall collapse and fortuitously discovered one or more unrelated code problems. There was a direct connection between the covered damage and the additional work required to the building.
As in Grays Harbor, the prior nonconforming condition was considered legally acceptable before the disaster occurred. But after one wall collapsed, the condition of the other walls was reasonably perceived as posing a danger to human life and safety. See 84 P.3d at 308. It was the wall collapse that proximately caused the authorities to specifically look for similar problems elsewhere in the building and to designate the building as an "unsafe structure" when they found them. Further, the required upgrades concerned the same structural part of the building (the *1083 walls), the same building code provision, and the same type of repair (installation of angle irons).
The language of the policy itself also supports our conclusion that there is coverage here. In this case, the policy explicitly excluded pre-existing code violations which the insured had failed to correct. However, the policy did not specifically exclude situations where, as here, a covered structure was grandfathered under the current code but lost its grandfathered status because of the occurrence of covered damage. See N.J.A.C. 5:23-6.2(f); N.J.A.C. 5:23-2.32. In that respect, the case is analogous to the situation in Regents, where repairing the fire damage triggered ADA-related expenses in remodeling undamaged portions of the building. If the insurer intended to exclude coverage in such situations, it could have specifically so provided.[5]See Feinbloom v. Camden Fire Ins. Ass'n, 54 N.J.Super. 541, 544-45, 149 A.2d 616 (App.Div.), certif. denied, 30 N.J. 154, 152 A.2d 172 (1959) (finding coverage for the entire loss where, by operation of local zoning law, the insured was required to raze rather than repair a nonconforming structure that suffered extensive fire damage); Danzeisen v. Selective Ins. Co. of Am., 298 N.J.Super. 383, 388-89, 689 A.2d 798 (App.Div.1997) (insurer failed to craft clear policy language to avoid the Feinbloom rule).
Affirmed.
NOTES
[1] Although not the subject of this insurance coverage claim, plaintiff had made similar repairs to one wall of the eighth floor of the building in 2001. The local building inspector approved the work, but did not, at that time, require plaintiff to secure the walls to the floors throughout the rest of the building.
[2] Paragraph F of the Ordinance or Law Coverage section excludes "loss due to any ordinance or law that [the insured was] required to comply with before the loss, even if the building was undamaged" but the insured "failed to comply with."
[3] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
[4] To the extent defendant has raised additional arguments in Point II and in its reply brief, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
[5] Notably, in his deposition, GNY's senior claims examiner Robert H. Penn admitted that the policy language was unclear: "There are gray areas in this coverage and ... it is the subject of much discussion and debate even today. This coverage has been around a long time and the wording has changed over the years, but it is a coverage that almost always there are disputes every year with every company that writes commercial insurance."