

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-16-2006

# The Regents v. Republic Franklin

Precedential or Non-Precedential: Precedential

Docket No. 04-3653

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"The Regents v. Republic Franklin" (2006). *2006 Decisions.* Paper 522.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/522

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-3653

_____

THE REGENTS OF THE MERCERSBURG COLLEGE,
Appellant

v.

REPUBLIC FRANKLIN INSURANCE COMPANY

_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 00-cv-00558)
District Judge: Honorable James F. McClure, Jr.

_____

Argued January 9, 2006

Before: BARRY and AMBRO, Circuit Judges
and DEBEVOISE,[*] District Judge

_____

[*] Honorable Dickinson R. Debevoise, Senior District
Court Judge for the District of New Jersey, sitting by
designation.

(Opinion filed August 16, 2006)

Michael R. Libor, Esquire (Argued)
Christina E. Roberts, Esquire
Derek Eddy, Esquire
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA   19103

      Counsel for Appellant

Steven J. Polansky, Esquire (Argued)
Marshall, Dennehey, Warner, Coleman & Goggin
200 Lake Drive Easte
Woodland Falls Corporate Park, Suite 300
Cherry Hill, NJ   08002

      Counsel for Appellee

_____

OPINION OF THE COURT

_____

AMBRO, Circuit Judge

    This is an insurance coverage dispute arising out of a lightning strike and fire that damaged Keil Hall on the campus of Mercersburg Academy.  We affirm in part and reverse in part

2

the judgment of the District Court.

## I.  Factual and Procedural Background

Mercersburg, the insured, is a private secondary and college preparatory boarding school located in Mercersburg, Pennsylvania.  Keil Hall is a building located on the Mercersburg campus that was constructed over a century ago.  It has four levels above ground and a basement containing mechanical equipment.  The first floor of the building contains public spaces, including an auditorium and classrooms, while the second and third floors contain dormitory housing and common meeting areas.  The fourth floor was designed and constructed for dormitory use as well, and had been used for that purpose in the past.  At the time of the fire, however, that floor was used as attic and storage space, and was cordoned off from students.[1]

The chimney of Keil Hall was struck by lightning on June 13, 1998, igniting a fire that caused extensive damage to the roof and fourth floor of the building, as well as smoke and

---

[1]Mercersburg contends that, while the dormitory rooms on the fourth floor were unoccupied at the time of the fire due to declining enrollment, the Academy had plans to expand enrollment and once again use the fourth floor to house full-time and summer-program students.

water damage to the first, second, and third floors. Following the fire, Mercersburg submitted a timely claim to its property insurance carrier, Republic Franklin Insurance Company, for (1) the costs to repair the actual fire damage, (2) additional costs to repair the building that were made necessary to bring the building in compliance with applicable laws and various building codes, and (3) lost business income.

Republic Franklin's primary policy only provides coverage for those repairs necessary to return the property to its pre-fire condition. Accordingly, Mercersburg purchased a separate "Ordinance and Law Endorsement" to its policy. That Endorsement provides in relevant part:

> 1. Coverage A – Coverage For Loss to the Undamaged Portion of the Building. If a Covered Cause of Loss occurs to covered Building property[,] . . . we will pay for loss to the undamaged portion of the building caused by enforcement of any ordinance or law that: (a) requires demolition of parts of the same property not damaged by a Covered Cause of Loss; (b) regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and (c) is in force at the time of loss.
>
> . . .

4

3. Coverage C – Increased Cost of Construction Coverage. If a Covered Cause of Loss occurs to covered Building property[,] . . . we will pay for the increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance or law.

The insurer's failure to reimburse the Academy for all of its costs incurred as a result of the fire prompted it to file a complaint in United States District Court for the Middle District of Pennsylvania alleging breach of contract and bad faith. Specifically, Mercersburg contended that the Ordinance and Law Endorsement required Republic Franklin to pay for repair and renovation costs required by the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, the Pennsylvania Handicapped Act and Universal Accessibility Standards promulgated thereunder, 71 Pa. Cons. Stat. § 1455 *et seq*. (2000) & 34 Pa. Code § 60.1 *et seq*., as well as other Pennsylvania statutes and national building codes (including the International Mechanical Code, the Building Officials and Code Administrators International, Inc. Code, the National Electric Code, the International Plumbing Code and the standards of the American Society of Heating, Refrigerating and Air-Conditioning Engineers).

5

After extensive factual and expert discovery, the parties settled, resolving all disputes except those related to the Ordinance and Law Endorsement claim.[2] Republic Franklin's motion for summary judgment on those claims was granted by the District Court. It held that (1) the ADA did not apply because the dormitory space in Keil Hall was not a "public accommodation" within the meaning of that statute, (2) the PHA also did not apply because the costs of the fire damage did not reach the threshold cost to trigger coverage under the Act, and (3) nationally recognized standards of design and construction and Pennsylvania laws that require private schools to meet certain basic safety standards were inapplicable because the Borough of Mercersburg had not officially adopted any building code. This appeal followed.[3]

### III. Standard of Review

---

[2]Mercersburg completed all renovations and repairs to Keil Hall in December 2000. As of this appeal, Republic Franklin has paid out $359,696.87 to the Academy. The total cost of the repairs and renovations was $2,449,073.85.

[3]There is no dispute that the parties have diverse citizenship and the amount in controversy exceeds the jurisdictional requirement. Thus, the District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Because Mercersburg appeals the final judgment of the District Court, we have jurisdiction under 28 U.S.C. § 1291.

Summary judgment is appropriate if there are no genuine issues of material fact presented and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). As far as the former, we resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). "We exercise plenary review over summary judgment and we apply the same standard that the lower court should have applied." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

The primary legal issue here is the interpretation of the scope of coverage of the Ordinance and Law Endorsement. "The interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court, a question over which [this court] exercise[s] plenary review." *Med. Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999); *McMillan v. State Mut. Life Assurance Co. of Am.*, 922 F.2d 1073, 1074 (3d Cir. 1990).

Where, as here, federal jurisdiction is based on diversity of citizenship, we apply the choice of law rules of the state in which the District Court sat. *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). As noted, this action was filed in the Middle District of Pennsylvania. Under Pennsylvania choice of law rules, an

7

insurance contract is governed by the law of the state in which the contract was made. *Crawford v. Manhattan Life Ins. Co.*, 221 A.2d 877, 880 (Pa. Super. 1966); *see also McMillan*, 922 F.2d at 1074.[4] "An insurance contract is 'made' in the state in which the last act legally necessary to bring the contract into force takes place." *Crawford*, 221 A.2d at 880. The parties agree that the insurance contract was 'made' in Pennsylvania and, consequently, Pennsylvania substantive law applies.

We now consider in turn each of the District Court's grounds for granting summary judgment in favor of Republic Franklin.

### III. Merits

#### A. ADA Claim

Mercersburg asserts that numerous accessibility upgrades made to Keil Hall were required to comply with the dictates of

---

[4]We note that another line of Pennsylvania cases holds that choice of law in an insurance contract is to be determined by looking to the law of the state with the most significant relationship with the contract. *See, e.g.*, *Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. 2005). The choice between these tests is not determinative here, as Pennsylvania also had the most significant relationship with the contract.

Title III of the ADA[5] and, thus, the costs of those upgrades are covered under the Ordinance or Law Endorsement. The District Court ruled that the ADA protections afforded disabled persons do not apply to the dormitory space on the second, third and fourth floors of Keil Hall because dormitory housing is not considered "transient lodging" that is covered under the ADA. Citing 28 C.F.R. Part 36 Appendix A, Mercersburg responds that the ADA's regulations specifically include dormitories as "transient lodging," and hence the Endorsement covers the costs of accessibility modifications required by the ADA.

Under Title III of the ADA,[6] it is unlawful for a public

_____

[5]Title I of the ADA prohibits discrimination in employment and provides that rights and remedies available under Title VII of the Civil Rights Act of 1964 are available as well under Title I of the ADA. *Id*. § 12117. Title II prohibits discrimination by a "public entity." *Id*. § 12132. Finally, Title III—the one that applies here—prohibits discrimination in "public accommodations." *Id*. § 12182.

[6]The ADA's goals are familiar: (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the federal Government plays a central role in enforcing the standards established on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional

accommodation to discriminate against an individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations. *Id*. § 12182(a). "Public accommodation" is defined in terms of 12 categories,[7] which the legislative history indicates "should be

_____

authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, to address the major areas of discrimination faced day-to-day by people with disabilities. 42 U.S.C. § 12101(b).

[7]Specifically,

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor; (B) a restaurant, bar, or other establishment serving food or drink; (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; (D) an auditorium, convention center, lecture hall, or other place of public gathering; (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment; (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health

10

construed liberally" to afford people with disabilities "equal access" to the wide variety of establishments available to the nondisabled. S. Rep. No. 101-116, p. 59 (1989); H.R. Rep. No. 101-485, pt. 2, p. 100 (1990), U.S. Code Cong. & Admin. News 1990, pt. 2, at pp. 303, 382-383. The ADA obligates a "public accommodation" only with respect to a "facility" that is "used as, or designed or constructed for use as," either a place of public accommodation or a commercial facility. 28 C.F.R. § 36.102(b)(3)(i)-(ii). When a public accommodation or a part of it is altered, the Act requires that alterations be made so that "the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals

care provider, hospital, or other service establishment; (G) a terminal, depot, or other station used for specified public transportation; (H) a museum, library, gallery, or other place of display or collection; (I) a park, zoo, amusement park, or other place of recreation; (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).

11

who use wheelchairs." 42 U.S.C. § 12183(a). If an alteration

> could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations . . . are not disproportionate to the overall alterations in terms of cost and scope . . . .

*Id*. § 12183(a)(2).

Given this legal landscape, our analysis of the ADA claim proceeds as a three-part inquiry: whether (1) Mercersburg Academy is a "public accommodation," (2) the repairs and renovations made to Keil Hall are "alterations," and (3) Keil Hall is a "facility" that is "used as, or designed for use as," either "a place of public accommodation" or "a commercial facility."

The District Court held that Mercersburg satisfied the "public accommodation" requirement and that its repairs and renovations to Keil Hall were "alterations" within the meaning of the ADA. Each of these determinations is correct. Mercersburg is a "secondary school," which by definition

12

makes it a "place of education," and, accordingly, a "public accommodation" under 42 U.S.C. § 12181(7)(J). Moreover, existing regulations establish that the repairs made to Keil Hall were "alterations" because they included "remodeling, renovation, [or] reconstruction . . . ." 28 C.F.R. § 36.402(b)(1) ("Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions."). Thus, the first two steps of our three-step inquiry are easily satisfied.

The third step is markedly more difficult. The District Court first held that the four floors of Keil Hall "should each be evaluated separately as to whether they are covered under the ADA, rather than evaluating Keil Hall as whole," to determine whether the floors are "used as, or designed or constructed for use as," a place of public accommodation. Employing that principle, the Court held that the first floor of Keil Hall was used as a "public accommodation" under the ADA because it contained classrooms, *see* 42 U.S.C. § 12181(7)(J) (a place of education), and an auditorium, *see id*. § 12181(7)(D) (a place of public gathering), but that the second through fourth floors were not "public accommodations" because dormitories do not fall within any of the twelve categories enumerated in 42 U.S.C. § 12181(7). According to the Court, dormitories are more akin to residential units such as apartments and condominiums—which are not covered by the ADA—than transient lodging like inns,

13

hotels, and motels—which are covered under § 12181(7)(A).

Mercersburg argues that the District Court erred because (1) private-school dormitories are "transient lodging" as defined by the ADA regulations and (2) dormitories are part of boarding schools, and, as such, are places of education. We agree. Although the statutory definition of "public accommodation" does not expressly mention private school dormitories, those facilities satisfy that definition under conventional principles of interpretation.[8]

---

[8]Neither the District Court nor Republic Franklin was able to point to any authority holding that dormitories are more like residential facilities than "transient lodging" for ADA purposes. Indeed, both the Court and the insurer rely almost exclusively on a 13-year-old District Court opinion that is not on point: *Independent Housing Services of San Francisco v. Fillmore Center Associates*, 840 F. Supp. 1328 (N.D. Cal. 1993).

In *Independent Housing Services*, the Court addressed whether a residential facility was a public accommodation. It was undisputed that the facility had commercial entities occupying the ground floor, which fell within the purview of the ADA accessibility standards. But were the residential apartments occupying the upper floors subject to the ADA accessability standards? The Court examined the legislative history of the ADA, and concluded it was not intended to apply to residential facilities.

42 U.S.C. § 12182 concerns discrimination in

14

The ADA's implementing regulations belie Republic Franklin's contention—and the District Court's ruling—that the ADA does not apply to dormitories. *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (citing *Chevron U.S.A., Inc. v. Natural Res. Defense Counsel, Inc.*, 467 U.S. 837, 844 (1984), and explaining that the implementing regulations and views of the United States Department of Justice (DOJ) as to the ADA are entitled to deference). The ADA Accessibility Guidelines (ADAAG) provide that design, construction, or alteration of facilities in conformance with the ADA "shall comply with the

> public accommodations. Section 12181(7)(A) includes "an inn, hotel, motel, or other place of lodging" within the definition of public accommodations. However, the legislative history of the ADA clarifies that the "other place of lodging" does not include residential facilities. H.R. Rep. No. 101-485(II), 101st Cong., 2d Sess. 383 (1990).

*Id*. at 1344 n.14. It then concluded that "apartments and condominiums do not constitute public accommodations within the meaning of the [ADA]." *Id*. at 1344.

*Independent Housing Services* does little to advance Republic Franklin's argument that private school dormitories are not "transient lodging" under the ADA. We agree that residential facilities such as apartments and condominiums are not transient lodging and, therefore, not subject to ADA compliance. But we believe dormitory housing, which is by its very nature temporary, is different.

15

applicable provisions of Appendix A to this part (ADAAG)."
28 C.F.R. § 35.151. Chapter 9 of Appendix A to the ADAAG
provides guidelines for "Accessible Transient Lodging," which
specifically includes "Hotels, Motels, Inns, Boarding Houses,
*Dormitories*, Resorts and *Other Similar Places of Transient
Lodging*." 28 C.F.R. Part 36 App. A, Ch. 9.1 (emphases
added). Moreover, Chapter 3 of the ADAAG expressly states
that transient lodging includes "[a] building, facility, or portion
thereof, excluding inpatient medical care facilities and
residential facilities, that contains sleeping accommodations.
Transient lodging may include, but is not limited to, resorts,
group homes, hotels, motels, and *dormitories*." 28 C.F.R. Part
36 App. A, Ch. 3.5 (emphasis added). In a nutshell, the ADA
regulations expressly define dormitories as transient lodging
and provide that any construction or alterations to dormitories
occurring after January 26, 1992, must comply with the ADA
and its guidelines. 28 C.F.R. § 36.402(b).

Beyond the plain language of the ADA implementing
regulations, there is an additional reason to rule that it applies
to private-school dormitories: student housing—an integral part
of boarding school experience—is one of the facilities,
privileges, advantages, and accommodations of a place of
education covered by Title III of the ADA. As a private
secondary school, Mercersburg itself is a "public
accommodation" that is required to comply with the ADA. 42
U.S.C § 12181(7)(J). A school may not discriminate on the
basis of a student's disability nor deny a reasonable

16

accommodation to a disabled student. On-campus housing facilities such as dormitories are certainly part of the "goods, services, facilities, privileges, advantages, and accommodations" offered by schools to its students. 42 U.S.C § 12182(a). Thus, Mercersburg could not lawfully deny a disabled student a reasonable accommodation that would permit him or her to live in its dormitories. Indeed, the DOJ has consistently taken the position that all aspects of a school's student activities and of the educational experience (including, for example, research activities and fraternity housing) are covered by Title III of the ADA. *See* DOJ, "Americans with Disabilities Act Technical Assistance Letters," Doc. # 488, at http://www.usdoj.gov/crt/foia/talindex.htm (May 2, 1994) (stating that fraternity houses, owned and operated by a university, "like all other aspects of a university experience, are part of the place of education, and are covered by title III"); *see also* DOJ, "Americans with Disabilities Act Technical Assistance Letters," Doc. # 128, at http://www.usdoj.gov/crt/foia/talindex.htm (July 8, 1992) (stating that research activities conducted by a university, even if primarily for pharmaceutical research rather than education, are covered by Title III as part of the university's obligation to ensure "compliance with [T]itle III in all of the activities of the place of public accommodation that it owns or operates[, a] provision . . . intended to be read broadly").[9] For the same

[9]In *Bragdon v. Abbott*, the Supreme Court drew guidance from several of the DOJ's technical assistance letters. 524 U.S.

17

reasons, the DOJ has taken the position that student housing is covered by Title III of the ADA. *See id*., "United States' Brief as Amicus Curiae in Opposition to Emory University's Motion to Dismiss," at http://www.ada.gov/briefs/barkopbr.pdf (stating that "student housing owned and operated by a private university is covered by [T]itle III of the ADA as a facility, privilege, advantage, and/or accommodation of a place of education").[10]  In this context, we hold that the ADA applies

_____

624, 646 (1998).

[10]The DOJ filed an *amicus* brief in an ADA case pending in the United States District Court for the Northern District of Georgia, *Barker v. Emory University*, No. 02-CV-2450-CC. DOJ, "United States' Sur-Reply Brief as Amicus Curiae in Opposition to Emory University's Motion to Dismiss," at http://www.ada.gov/briefs/barkerbr.pdf.    The plaintiffs, a student at the Emory University School of Law and a disability rights advocacy group, sued Emory claiming that a number of facilities on its campus are inaccessible, including a new student apartment complex owned and operated by the University. Emory asked the Court to dismiss the case, arguing that the apartment complex and other dormitories on campus are not covered by Title III of the ADA because they are "strictly residential."     The Government disagreed, unequivocally advancing the position that campus housing is covered by Title III of the ADA.  According to the DOJ,

> Emory [wa]s obligated to ensure that all admitted students have 'full and equal enjoyment of the goods, services, facilities, privileges, advantages,

or accommodations' that it provides . . . These include its residential housing program.

*Id*. at 2.

The DOJ emphasized that "the categories of places of public accommodation [should be read] broadly" and "student housing is covered by the ADA under the broad category of a place of education." *Id*. at 5, 6.

. . . Emory argues that dormitories are only covered by Title III if they offer short-term stays, because dormitories are listed in the heading of section 9.1 of the Department's ADA accessibility standards: "Hotels, Motels, Inns, Boarding Houses, Dormitories, Resorts and Other Similar Places of Transient Lodging." 28 C.F.R. Pt. 36 App. A § 9. Emory's argument fails, however, because Emory has neglected to distinguish the issue of whether an entity is covered by title III from the subsequent inquiry about what standards apply to a particular covered entity. . . . The Department's position that dormitories are covered as places of education is not inconsistent with the fact that the standards mention dormitories as a type of transient lodging: to the contrary, *the reference to dormitories in the standards is a clear indication that coverage of such facilities was anticipated by the drafters of the regulation*.

*Id*. at 6-7 (emphasis added). Moreover, "[t]he length of a student's stay in college housing is irrelevant because student

19

to private-school dormitories and, therefore, to all four floors of Keil Hall.[11]

housing is covered by the ADA under the broad category of a place of education."

[11]Although it ruled that the first floor of Keil Hall was subject to the demands of the ADA, the District Court went on to conclude that Republic Franklin was not liable for the renovation costs on that floor, stating:

> Because Mercersburg was required to ensure that the first floor complied with ADA prior to the fire, the Ordinance or Law [E]ndorsement was not triggered. Accordingly, Republic is not liable for the expenses related to the repairs made to the first floor as required by the ADA.

Mercersburg argues that the Endorsement does not contain any "trigger" requirement. According to the Academy, the Endorsement provides coverage for loss to undamaged portions of the building caused by enforcement of any law or ordinance regulating the construction or repair of buildings that is in force at the time of the loss. Thus, in Mercersburg's view the ADA—a law in force at the time of the loss—required it to provide "maximum accessability" to the disabled when making its alterations to Keil Hall.

We disagree. Coverage A of the Endorsement will pay for "*loss* to the undamaged portion of the building caused by enforcement of any ordinance or law that . . . is in force at the time of loss." (Emphasis added.) Although "loss" is not specifically defined in the policy, it provides the "trigger" that

20

In light of our disagreement with the District Court as to the applicability of the ADA to dormitories, one question remains: whether any post-fire renovations made to the undamaged portions of Keil Hall were demanded by the ADA. There are two standards of compliance under the ADA: the new construction standard and the alteration standard. New construction is the highest standard,[12] and it applies to public

Republic Franklin claims. When voluntary repairs are undertaken to undamaged portions of the building, there may be costs imposed by enforcement of a law or ordinance, but those costs are not a "loss." Only when some actual Covered Cause of Loss has caused damage to the building, the repair of which must legally be accompanied by changes to the undamaged portion of the building, can the law or ordinance be said to have caused a "loss." Similarly, Coverage C of the Endorsement refers to "the increased cost to repair, rebuild, or construct *the* property" (emphasis added) only when a Covered Cause of Loss has occurred "to covered Building property." This phrasing, which directly links the rebuilt property to the damaged property, does not mention voluntary reconstruction of undamaged portions and should not be taken to refer to them.

[12]*See* ADA Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities ("Title III Preamble"), Pt. 36, App. B, at 645 ("In striking a balance between guaranteeing access to individuals with disabilities and recognizing the legitimate cost concerns of businesses and other private entities, the ADA establishes different standards for existing facilities and new

21

accommodations designed or constructed after January 26, 1992, and to the portion of a facility altered after that date. *See* 42 U.S.C. § 12183(a); H.R. Rep. No. 101-485(III) at 60, *reprinted at* 1990 U.S.C.C.A.N. 445, 483 (explaining that "[b]ecause it costs far less to incorporate accessible design into the planning and construction of new buildings and of alterations [as compared to retrofitting existing structures], a higher standard of 'readily accessible to and usable by' persons with disabilities has been adopted in the ADA for new construction and alterations"); and 28 C.F.R. Part 36, App. B, Section 36.402 (stating that, with respect to altered portions, "[t]his part *does not require alterations; it simply provides that when alterations are undertaken, they must be made in a manner that provides access*") (emphasis added); *see also Brother v. CPT Investments, Inc.*, 317 F. Supp. 2d 1358, 1370 (S.D. Fla. 2004) (stating that the ADA does not require alterations). The new construction standards are contained in 28 C.F.R. Part 36, and, as discussed above, the ADAAG are set forth in Appendix A of Part 36.

Existing facilities also must comply with the ADA, but that obligation is governed by the barrier removal provision.[13]

_____

construction.").

[13]The ADA's barrier removal provision requires the removal of structural barriers in existing facilities when it is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). This is

Of course, if existing facilities are altered, they must conform to the alteration standard, which requires that alterations, as well as the path of travel to "primary function" areas, be made readily accessible to disabled individuals. 42 U.S.C. § 12183(a)(2).[14] "Areas containing primary functions refer to

---

so when it is "easily accomplished and able to be carried out without much difficulty or expense." *Id*. § 12181(9). Compliance with the ADA's barrier removal provision may require, for example, the installation of a concrete ramp, a widened exterior door, or the modification of an existing public restroom. 28 C.F.R. § 36.304(b). Where those public accommodations can demonstrate that barrier removal is not "readily achievable," they must try other methods that are. 28 C.F.R. § 36.305(a).

[14]In relevant part, 42 U.S.C. § 12183(a) provides:

[D]iscrimination for purposes of section 12182(a) of this title includes . . .

(2) with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. Where the entity is undertaking an alteration that affects or could affect usability of or access to an

23

those portions of a place of public accommodation where significant goods, services, facilities, privileges, advantages or accommodations are provided." H. Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 112 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 486. As a practical example, "the path of travel to . . . bathrooms, telephones, and drinking fountains [must be] . . . readily accessible to and usable by individuals with disabilities." *Id*. at 394. As our Court has observed,

> while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner. The use of such changes must be made available to all. The

area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are not disproportionate to the overall alterations in terms of cost and scope (as determined under criteria established by the Attorney General).

> emphasis on equal treatment is furthered, as well, by an expansive, remedial construction of the term "usability." Usability should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access.

*Kinney v. Yerusalim*, 9 F.3d 1067, 1973 (3d Cir. 1993). It is clear, then, that to the extent the ADA—a law in force at the time of the fire—regulated the alterations to Keil Hall (a public accommodation) after the fire and required the Academy to make paths and travel accessible to the primary-function areas on each floor of Keil Hall, the plain language of the Ordinance and Law Endorsement covers Mercersburg's costs of complying with the ADA.

With this backdrop, we part with the District Court in two respects. First, because dormitories are "transient lodging" and Mercersburg is a "place of education," we conclude that the dormitory floors of Keil Hall are public accommodations within the meaning of the ADA. Second, because the Endorsement requires the insurer to cover alterations to the undamaged portions of Keil Hall caused by enforcement of the ADA, Republic Franklin may be liable for certain expenses not directly caused by the fire. Of course, any alterations, renovations and/or improvements made to any floor of Keil Hall that were not mandated by the ADA (*i.e.*, discretionary alterations) do not fall within the scope of coverage of the

25

Endorsement, and, as a result, do not obligate the insurer. Given that the ADA applies to all four floors of Keil Hall, it is for the District Court to determine on remand specifically which renovations (if any) undertaken by Mercersburg in its repair of Keil Hall were mandated by the ADA—an issue the Court did not reach in its memorandum opinion. Therefore, we reverse the District Court's grant of summary judgment in favor of Republic Franklin on Mercersburg's ADA claim and remand the case for proceedings not inconsistent with this analysis.

## B. PHA Claim

Mercersburg also contends that, much like the ADA, the Universal Accessibility Standards promulgated under the Pennsylvania Handicapped Act (PHA), 71 Pa. Cons. Stat. § 1455.1 *et seq*. (2000); 34 Pa. Code § 60.1 *et seq*., required the accessability upgrades, including the installation of an elevator, to Keil Hall. The District Court held that the PHA did not require modifications to Keil Hall because the repairs required by the fire total less than 30% of the building's value.

The PHA requires that certain structural improvements be made to maximize accessibility and usability by persons with physical handicaps. 71 Pa. Cons. Stat. § 1455.1. Unlike the ADA, the PHA generally applies to "buildings used by the public" rather than to certain enumerated "public accommodations." *Id*. § 1455.1b. Moreover, the PHA expressly applies to "schools" and "dormitories." *Id*.

26

Under it, when an existing private building is remodeled, the remodeling must be done to ensure that the remodeled area is "accessible to and usable by persons with physical handicaps" to a degree based on the proportional cost of the remodeling to the overall worth of the building. *Id*. § 1455.1c(b)(1). If the construction cost of the remodeling is less than 30% of the value of the building, only the remodeled area or areas shall be made accessible to and usable by persons with physical handicaps. An accessible route to the remodeled area or areas is not required. *Id*. § 1455.1c(b)(1)(i). If "the construction cost of the remodeling is greater or equal to 30 percent but less than 50 percent of the worth of the building, the remodeled area or areas shall be made accessible to and usable by persons with physical handicaps, and an accessible route to the remodeled area or areas shall be provided." *Id*. § 1455.1c(b)(1)(ii). If the construction cost is 50 percent or more of the value of the building, the entire building must be made accessible to and usable by handicapped persons. *Id*. § 1455.1c(b)(1)(iii). For purposes of the latter two subsections, construction made over a three-year period may be calculated as the construction cost. *Id*. § 1455.1c(b)(1)(iv).

The same analytical framework applicable to the ADA claim, discussed above, necessarily applies to Mercersburg's PHA claim. Simply stated, the lightning strike only damaged certain portions of Keil Hall; when those portions were remodeled, Mercersburg was required to comply with the PHA; Republic Franklin, in turn, was obligated to pay for that

27

remodeling (which it has done); it was only obligated to pay for further remodeling to undamaged portions of Keil Hall if that remodeling was required by an ordinance or law.

The question, then, is whether the PHA required any further remodeling. As explained above, the answer to that inquiry depends on a factual determination and the cost of remodeling compared to the worth of Keil Hall. Specifically, if the repairs required by the fire total less than 30% of Keil Hall's total value, the PHA requires no further modifications and it follows that Republic Franklin is not obligated to cover the cost of any further modifications. The converse is also true: if the repairs required by the fire total exceed 30% of Keil Hall's total value, then the PHA demands further modifications and it follows that Republic Franklin must cover all or some of the portion of the cost of those modifications under the Ordinance and Law Endorsement.

Both sides agree that the total value of Keil Hall is $1,900,000. Moreover, during oral argument, counsel for Mercersburg agreed that the aggregate cost of repair to Keil Hall caused by the fire totals substantially less than 30% of the total value of the building. As a result, the PHA required no further modifications to Keil Hall. Accordingly, we affirm the District Court's grant of summary judgment in favor of Republic Franklin on the PHA claim.

28

### C. Building Codes

Finally, Mercersburg contends that the Ordinance and Law Endorsement provides coverage for renovations it made to undamaged portions of Keil Hall pursuant to, *inter alia*, the International Mechanical Code, Building Officials and Code Administrators International, Inc. Code, the National Electric Code, the International Plumbing Code, and the standards of the American Society of Heating, Refrigeration and Air-Conditioning Engineers.  It is undisputed that the Borough of Mercersburg, in which the Academy is located, has adopted none of the foregoing codes nor any other building codes.  Relying on that fact, the District Court held that the terms "law" and "ordinance" in the Endorsement should be afforded their ordinary meaning.  As such, it refused to construe those terms to include building codes or standards adopted by private organizations but not adopted by a governmental body having authority to do so here.

The basic principles of law governing insurance policy interpretation are well-settled in Pennsylvania.  *E. Associated Coal Corp. v. Aetna Cas. & Surety Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980).  The goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties.  It begins where it must—the language of the policy.  *Madison Constr. Co.*, 735 A.2d at 106 ("The polestar of our inquiry . . . is the language of the insurance policy.").

29

The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Gene & Harvey Builders v. Pa. Mfrs. Ass'n*, 517 A.2d 910, 913 (Pa. 1986) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)) (additional citations omitted).

Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (Pa. Super. Ct. 1986); *see also Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). Courts should not, however, distort the meaning of the language or strain to find an ambiguity. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. Super. Ct. 1982).

Mercersburg asks us to rule that the plain and ordinary meaning of "law" and "ordinance" in the Endorsement is

30

broader than the interpretation given by the District Court. We need not reach this issue. This is because, even if the District Court did read those terms too narrowly, that determination does not resolve the larger controversy before us: whether the "loss to undamaged portion[s]" of Keil Hall was "caused by enforcement of any" of the codes. This inquiry must be answered no. Unlike the ADA and PHA, Mercersburg fails to point out any provisions of the building codes that mandated or required it to do any upgrades, renovations, *etc*., to the undamaged portions of Keil Hall. Certainly, Mercersburg's discretionary decision to renovate undamaged portions of Keil Hall triggered the application of the building codes as to that renovation, but critically important is that the building codes themselves did not trigger those renovations. This distinguishes Mercersburg's building codes claims from its ADA and PHA claims. As a result, we affirm the District Court's determination (albeit on different grounds than the District Court) that the Ordinance and Law Endorsement does not provide coverage for renovations it made to undamaged portions of Keil Hall in hypothetical compliance with codes not mandating those renovations.

## VI.    Conclusion

We reverse the District Court's summary judgment ruling dismissing Mercersburg's ADA claim and remand that claim for proceedings not inconsistent with this opinion, but affirm its summary judgment rulings dismissing Mercersburg's PHA and building codes claims.

31