# In the Iowa Supreme Court

No. 23–0321

Submitted January 21, 2025—Filed March 7, 2025

**Waterloo Community School District,**

Appellant,

vs.

**Employers Mutual Casualty Company,**

Appellee.

Appeal from the Iowa District Court for Polk County, Jeffrey D. Bert, Business Specialty Court Judge.

A school district appeals the summary judgment for its property insurer on the costs to restore a building after a partial roof collapse. **Affirmed.**

Waterman, J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of the case.

Shelli L. Calland (argued) of Weisbrod Matteis & Copley PLLC, Washington, D.C., and Stephen R. Eckley of Eckley Law PLLC, Des Moines, for appellant.

Sean M. O'Brien (argued) and Benjamin J. Kenkel of Dickinson, Bradshaw, Fowler & Hagen, P.C., Des Moines, for appellee.

**Waterman, Justice.**

In this appeal, we must decide whether the district court correctly construed an insurance contract to ascertain the coverage owed for a partial roof collapse. A school district insured its buildings through a policy that covered abrupt collapses caused by perils, including the weight of snow and ice. After a heavy snowstorm, part of the roof of an aged elementary school building collapsed into a second-floor classroom. The collapse and subsequent investigations revealed that load-bearing walls throughout the building had deteriorated, and the entire building was declared unsafe for occupancy. The school district demanded that the insurer pay to restore the load-bearing walls for the entire building, but the insurer agreed to pay only for the area of the collapse. The school district sued for the larger amount, and the district court granted summary judgment for the insurer. The school district appealed, and we retained the case.

On our review, we affirm the district court's judgment. The school district relies on the policy's "ordinance and law" provision that can extend coverage for costs to fix areas of the building undamaged by a collapse when such restoration is required by local building codes. But this additional insurance coverage is subject to an unambiguous exception for pre-existing code violations. The deterioration within the load-bearing walls pre-dated the partial roof collapse and violated the local building codes. Under the plain language of this exception, it is irrelevant that the school district was unaware of the deterioration of the walls before the collapse. A contrary holding would convert this insurance policy into a general maintenance contract. We hold the insurer must only pay to repair the damage from the partial roof collapse but not the cost to remedy the

longstanding deterioration in other areas of the building unaffected by the collapse.

## I. Background Facts and Proceedings.

February 20, 2019, was a snow day for the Waterloo Community School District (WCSD). Classes were canceled. Several feet of snow had already fallen that month, and heavy snow accumulated on the roof of Lowell Elementary School, a nearly ninety-year-old building on Washington Street. That morning, part of the roof collapsed into an empty second-floor classroom. Investigations into the cause of the collapse determined that the roof failed under the weight of the snow and because of pre-existing, hidden deterioration of mortar in the load-bearing walls supporting the roof. The longstanding deterioration was found in the load-bearing walls throughout the school, and local authorities deemed the entire building unsafe for occupancy.

Lowell Elementary School was built in 1931. The exterior walls of the building consisted of three layers (also called wythes). The outer layer (visible from the street) was cosmetic brick cladding. The inner layer (visible within the classrooms) was finished plaster. Neither of these layers was load-bearing. Sandwiched between them and completely concealed was the middle layer made of hollow clay masonry units held together by mortar. The middle layer was load-bearing and supports the steel joists holding up the roof.

The building underwent no major renovations until 2006, when a new metal roof was installed, two additions were built, and the exterior walls on the north side were tuckpointed. But those renovations did not involve the load-bearing walls in the rest of the building. It is undisputed that WCSD was unaware of the deterioration of the mortar within the concealed, load-bearing

layer. WCSD was never cited for any building code violations at Lowell Elementary School before the partial roof collapse.

WCSD had purchased commercial property insurance for its buildings from Employers Mutual Casualty Company (EMC). Both WCSD and EMC hired experts to investigate the collapse. WCSD hired Bradley Penar of ISG, Inc., an architectural and engineering firm, as well as Tony Childress of Childress Engineering Services. Childress concluded that "the primary cause of the collapse should be attributed to the ice and snow load on the roof." Both experts viewed the decades of deterioration of the load-bearing wall as a contributing factor. EMC hired several experts to investigate the collapse as well. One of those experts, Brian Heffernan of HDHY Engineering, stated, "The cause of the collapse is a combination of age deterioration and weight of ice and snow." He further explained, "The age deterioration of the wall is from long-term water infiltration." Heffernan noted, "The mortar in the upper portion of the wall was soft and sand-like in many locations. Larger mortar sections could be crushed by hand." Penar said that "the mortar had deteriorated and easily crumbled when handled." Experts for both WCSD and EMC agreed that the mortar in the load-bearing walls had deteriorated dangerously throughout the building, rendering the school unsafe for occupancy.

The City of Waterloo had adopted several standardized building codes, including the 2015 International Building Code (IBC), the 2015 International Existing Building Code (IEBC), and the 2015 International Property Maintenance Code (IPMC). Together, these codes prohibit occupying buildings that are "unsafe." *See* Int'l Prop. Maint. Code § 304.1.1(5) (2015) ("The following conditions shall be determined as unsafe and shall be repaired or replaced . . . : [s]tructural members that have evidence of *deterioration* . . . .");

Int'l Bldg. Code § 114.1 (2015) ("It shall be unlawful for any person, firm or corporation to . . . occupy any building . . . in conflict with or in violation of any of the provisions of this code."); *id.* § 116.1 ("Structures . . . that are or hereafter become unsafe . . . shall be deemed an unsafe condition [and] . . . shall be taken down and removed or made safe . . . ."). "Unsafe" is defined as "*dangerous* to human life or the public welfare." Int'l Bldg. Code § 116.1. Accordingly, any unsafe building cannot be reoccupied until it is "made safe." Based on the deteriorated state of Lowell Elementary's load-bearing walls, Waterloo Building Official Greg Ahlhelm notified WCSD on March 25 and June 9, 2020, that the building could not be occupied until it was made safe. That required not only repair of the collapsed roof but also restoring the structural integrity of the load-bearing walls throughout the building. Ultimately, WCSD decided to demolish the building and replace it with a new school building.

Meanwhile, WCSD submitted a claim with EMC requesting not only the costs to repair the area of the partial roof collapse but also the costs to address the deteriorated mortar in other areas of the building. EMC agreed to pay the costs to repair the area of the collapse alone. The parties disagreed about the coverage provided under EMC's policy.

Lowell Elementary School was insured under EMC's commercial property policy, which provides, "[EMC] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." A "covered cause of loss" is defined as "direct physical loss unless the loss is excluded or limited in Section B. Exclusions and Limitations." An exclusion states, "We will not pay for loss or damage caused by or resulting from . . . [c]ollapse, including . . . [a]n abrupt falling down or caving in . . . ." But an exception to the exclusion provides

that "[t]his exclusion . . . does not apply [t]o collapse caused by . . . [t]he 'specified causes of loss.' " The "weight of snow, ice or sleet" is included among the definitions for "specified causes of loss."

Another exclusion stated that the policy would "not pay for loss or damage caused by or resulting from . . . [w]ear and tear; . . . decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." WCSD purchased additional insurance against collapses, which provides:

> (2) [EMC] will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

> (a) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse . . . .

EMC acknowledged its obligation to pay to restore the roof and walls in the area of the collapse. EMC recognized that WCSD was unaware of the decayed mortar before the collapse. The disagreement between the parties centers on another additional coverage WCSD purchased, the Ordinance or Law (OL) provision, which states:

> (1) If there is an Ordinance or Law in effect at the time of loss that regulates zoning, land use or construction of a building, and if that law affects the repair or rebuilding of the lost or damaged building, and if you:

> (a) have repaired or rebuilt the building as soon as reasonably possible we will pay:

> (i) for the loss of the damaged and undamaged portion of the building;

> (ii) the cost to demolish and clear the site of the damaged and undamaged portions of the building; and

> (iii) if the Replacement Cost Additional Coverage applies, the increased cost to repair or rebuild a building intended for similar occupancy and of the same general size as the current property;

(b) do not repair, rebuild or replace the building, we will pay:

(i) the actual value of the damaged and undamaged portions of the building; and

(ii) the cost to demolish and clear the site of the damaged and undamaged portions of the building

(2) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a) You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

WCSD, relying on the OL provision extending coverage to *undamaged* portions of the building, argues EMC must pay for the costs to restore the deteriorated mortar in the load-bearing walls throughout the entire building to comply with Waterloo's building code. EMC in turn relies on the OL provision's exception for a failure to comply with the code before the collapse. EMC argues that exception applies because the deteriorated mortar rendered the building unsafe before the partial roof collapse and that WCSD had failed to comply with the code prohibiting occupancy of an unsafe building and prohibiting deterioration of load-bearing features. *See* Int'l Prop. Maint. Code § 304.1.1(5) ("The following conditions shall be determined as unsafe and shall be repaired or replaced . . . : [s]tructural members that have evidence of *deterioration* . . . ."). The parties disagree on whether the OL exception applies when WCSD was unaware of the deteriorated mortar that made the building unsafe before the collapse.

WCSD filed this action against EMC for the cost to restore the deteriorated mortar throughout the entire building. The parties conducted discovery and filed cross motions for summary judgment. The district court granted summary judgment for EMC on several grounds. First, the court concluded that WCSD

could only recover for the damage physically caused by the collapse. Second, the court applied the OL provision's exception for pre-existing code violations. Third, the court found that the separate exclusion for decay and deterioration barred coverage. The district court concluded that to "construe this Policy to cover the cost to repair undamaged portions of the building to make the building compliant with current building code requirements would cause insurers to reevaluate premiums for older buildings or worse, to decline to insure them at all."

WCSD applied for interlocutory review. We granted its application and retained the case.

## II. Standard of Review.

"We review a district court's summary judgment ruling that interprets an insurance policy for correction of errors at law." *City of West Liberty v. Emps. Mut. Cas. Co.*, 922 N.W.2d 876, 879 (Iowa 2019) (quoting *Just v. Farmers Auto. Ins.*, 877 N.W.2d 467, 471 (Iowa 2016)). "A grant of summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Just*, 877 N.W.2d at 471); *see* Iowa R. Civ. P. 1.981(3). "[W]e examine the record in the light most favorable to the nonmoving party." *Boelman v. Grinnell Mut. Reins.*, 826 N.W.2d 494, 501 (Iowa 2013). "We can resolve a matter on summary judgment if the record reveals a conflict concerning only the legal consequences of undisputed facts." *Id.*

## III. Analysis.

The facts determining coverage are undisputed. The heavy snowfall was a cause of the partial roof collapse, but it did not cause the deteriorated mortar. The mortar in the building's load-bearing walls had deteriorated long before the partial roof collapse. The deterioration rendered the entire building unsafe under

the local ordinance (building code). WCSD had failed to comply with the building code before the roof collapsed. The OL provision contains this exception: "Under this Additional Coverage, we will not pay any costs due to an ordinance or law that: (a) You were required to comply with before the loss, even when the building was undamaged; and (b) You failed to comply with." EMC argues, and the district court ruled, that this exception defeats WCSD's claim for the costs to fix the deteriorated mortar outside the area of the partial collapse. We agree.

This is not a case where the applicable building code excused (grandfathered) the owners of an older building from complying with current code requirements until a calamity necessitated major renovations.[1] The OL provision is designed, at least in part, to pay for the costs of a code upgrade in that scenario. But the OL provision also excepts coverage for pre-existing code violations. *Cf. Davidson Hotel Co. v. St. Paul Fire & Marine Ins.*, 136 F. Supp. 2d 901, 911 (W.D. Tenn. 2001) ("The breadth of the [OL] provision is not diminished by any limiting language regarding the 'grandfathered' status of code violations, as St. Paul would have the Court hold. . . . Simply, if St. Paul wished to avoid liability, it could have done so through the language of the contract."). And here,

---

[1]"The purpose of a grandfather provision for property owners is to 'avoid the harsh effect of the retroactive application' of a new rule of law." *Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 455 (Iowa 2016) (quoting *State v. Finders*, 743 N.W.2d 546, 549 (Iowa 2008)). "Housing codes include grandfather provisions to avoid constitutional challenges." *Id.*

> A grandfather clause, which allows the limited continuance of nonconformities, is included in zoning ordinances in order to avoid takings challenges. It is designed to strike a balance between a municipality's interest in abolishing nonconformities and the interests of property owners in maintaining land uses that were allowed when they purchased their property.

*Id.* (quoting *Day v. Town of Phippsburg*, 110 A.3d 645, 649 (Me. 2015)). Major renovations of a grandfathered structure can trigger a duty to bring the property into compliance with current building code requirements. *See, e.g.*, *id.* at 438, 455–56 (remanding case for determination whether renovations to apartment building triggered requirement to replace grandfathered thirty-two-inch balcony railings with forty-two-inch guardrails required by current building code).

the Waterloo building codes prohibited occupancy of an unsafe structure before the partial roof collapse. Neither party disputes that Lowell Elementary was in an unsafe condition prior to the collapse. The snowfall and roof collapse did not trigger a new legal obligation under the building code to address deteriorated mortar in other parts of the building. That obligation under the building codes pre-dated the collapse, as did WCSD's failure to comply. That difference is outcome determinative, as illustrated by this example:

> The logical boundaries to the scope of OL Coverage are best explained by analogy to a hypothetical. A store has a[n] . . . insurance policy. Two laws apply to the store: (1) a law requiring a wheelchair accessible restroom, and (2) a law requiring fire sprinklers. The laws are different in that the restroom law does not require immediate action—the storeowner does not need to close shop and expand the bathroom right away, but if the storeowner decides to remodel other aspects of the store, it must also expand the bathroom at that time. The fire sprinkler law is immediately applicable; if the store does not have working fire sprinklers at any time, it is violating the law.

> In the hypothetical, the store does not have a wheelchair accessible restroom or fire sprinklers. However, if an inspector came to check the store's compliance, it would only issue a violation for the sprinklers because the store owner's obligation to expand that bathroom has not been triggered.

> One day, a car crashes into the storefront. The accident is a covered cause of loss under the insurance policy and its repair requires a substantial rebuild of the front façade of the store. This rebuild triggers the obligation under the wheelchair accessibility law to expand the bathroom in the back of the store. It is entirely logical that, under an expansive OL Coverage provision, the insurance company would have to pay not only for the storefront rebuild, but also for the cost of expanding the existing restroom, even though it was undamaged, because the covered cause of loss triggered obligations under a law regarding restroom construction. However, in this scenario, the insurance company would not also be obligated to pay for installing fire sprinklers at this time because that deficiency and obligation pre-dated the occurrence of the covered cause of loss.

*CV Ice Co. v. Golden Eagle Ins.*, No. CV 14–121 PSG (SPx), 2015 WL 72313, at *11 (C.D. Cal. Jan. 6, 2015) (holding as a matter of law that the insurer was not obligated under OL provision to pay to replace corroded pipes).

Our approach to policy exclusions is well-settled. "[W]e strictly construe exclusions against the insurer." *Boelman*, 826 N.W.2d at 502. Therefore, "[i]f the policy is ambiguous, we adopt the construction most favorable to the insured." *Id.* "An insurance policy is not ambiguous, however, just because the parties disagree as to the meaning of its terms." *Id.* "If an insurance policy and its exclusions are clear, the court 'will not "write a new contract of insurance" ' for the parties." *Id.* (quoting *Thomas v. Progressive Cas. Ins.*, 749 N.W.2d 678, 682 (Iowa 2008)). "Moreover, '[a]mbiguity is not present merely because the provision "could have been worded more clearly or precisely than it in fact was." ' " *City of West Liberty*, 922 N.W.2d at 879 (alteration in original) (quoting *Just*, 877 N.W.2d at 471). "[W]e must enforce unambiguous exclusions as written." *Id.* (quoting *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015)).

In our view, the OL exception is unambiguous and applies regardless of whether the insured had been cited for a building code violation before the collapse and regardless of whether the insured was unaware of the pre-existing code violations. *See Celebrate Windsor, Inc. v. Harleysville Worcester Ins.*, No. 3:05CV282 (MRK), 2006 WL 1169816, at *18 (D. Conn. May 2, 2006). In *Celebrate Windsor, Inc. v. Harleysville Worcester Insurance*, the insured purchased insurance for its entertainment venue. *See id.* at *2–3. The venue was a permanent structure, resembling a circus tent, and the roof consisted of a large tarp-like structure. *Id.* at *1. During the winter months, a buildup of snow and ice on the roof caused tears throughout the canopy. *Id.* at *2. A subsequent

investigation revealed that the roof did not comply with local building codes because it was not strong enough to satisfy the safety requirements in place. *See id.* at *8. Yet the insured had never been cited for violating any building codes. *Id.* The insured sought payment from the insurance company for the weather damage as well as the increased costs to bring the roof up to code. *See id.* at *13. The insurance contract had an OL clause with an exception identical to EMC's provision at issue here: "[the insurance company] will not pay any costs due to an ordinance or law that: (a) You were required to comply with before the loss, even when the building was undamaged; and (b) You failed to comply with." *Id.* at *4.

The court observed that the exception "could not be clearer" and barred recovery for the increased cost of bringing the roof up to code. *See id.* at *18. The court applied the exception even though the insured had never previously been cited for code violations for the roof. *See id.* at *8, *18. Rather, the court observed that the insured was required to comply with the building code before the loss but failed to do so. *Id.* at *18. Therefore, the exception applied, and recovery was barred. We reach the same conclusion here.

WCSD in effect asks us to rewrite the OL exception to add a new knowledge requirement as follows:

> (2) Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:
>
> > (a) You [knew that you] were required to comply with before the loss, even when the building was undamaged; and
>
> > (b) You [knew that you] failed to comply with.

WCSD needs those bracketed terms included to prevail in this action. But "to adopt [WCSD's] interpretation[] would be to write a new contract for the parties." *Boelman*, 826 N.W.2d at 505. We cannot rewrite the contract. *Id.* at 502.

Rather, we read the insurance contract as a whole. *Id.* at 501. "This stems from the concept that '[w]ords in an insurance policy are to be applied to subjects that seem most properly related by context and applicability.'" *Id.* at 501–02 (alteration in original) (quoting *Jones v. State Farm Mut. Auto. Ins.,* 760 N.W.2d 186, 188 (Iowa 2008)). When EMC's policy requires the prior knowledge of the insured to exclude coverage, it says so explicitly. For example, under the collapse additional coverage provision, EMC will pay for losses caused by a collapse resulting from "[b]uilding decay that is hidden from view, *unless the presence of such decay is known to an insured* prior to collapse . . . ." (Emphasis added.)[2] Such a knowledge requirement is notably absent from the OL exception. If the drafters had intended to limit the OL exception to known code violations, the contract would have said so. It did not.

It is undisputed that the walls of Lowell Elementary were dangerously deteriorated to the point of making the building unsafe prior to the collapse. Waterloo Building Official Greg Ahlhelm testified that if he had been aware of the deteriorated mortar before the collapse, he would have required immediate remediation. WCSD's own expert noted that the load-bearing layer had likely been deteriorated for years, stating, "Although not able to be directly observed, it should be assumed that interior mortar is in poor condition over much of the 1930's era masonry wall." The expert also recognized the danger presented by this layer, stating, "In order to make the structure safe, complete and extensive masonry reconstruction that goes beyond tuckpointing is recommended for all

---

[2]We see no inconsistency between EMC's agreement to restore the load-bearing walls in the area of the collapse, and its refusal to pay to restore the walls in other parts of the building. The roof collapse was due to a covered peril (heavy snow) that caused a "direct physical loss of or damage to Covered Property" that EMC was obligated to pay for under Section A of the insuring agreement. The OL exception defeats coverage for pre-existing code violations in other areas of the building unaffected by the collapse.

second floor areas." This deterioration in load-bearing walls violates section 304.1.1 of the IPMC and section 116.1 of the International Building Code adopted by the City of Waterloo. Int'l Prop. Maint. Code § 304.1.1(5) ("The following conditions shall be determined as unsafe and shall be repaired or replaced . . . : [s]tructural members that have evidence of *deterioration . . . .*"); Int'l Bldg. Code § 116.1 ("Structures . . . that are or hereafter become unsafe . . . shall be deemed an unsafe condition [and] . . . shall be taken down and removed or made safe . . . ."). Additionally, the state of the walls constituted a violation regardless of whether it was ever noticed and enforced by the city. *See Chattanooga Bank Assocs. v. Fid. & Deposit Co. of Md.*, 301 F. Supp.2d 774, 780 (E.D. Tenn. 2004) ("Although the violations might have remained undiscovered if not for the fire, the violations in question existed . . . [and] w[ere] at all times subject to enforcement."). It matters not that specific violations were undiscovered before the collapse. The OL exception applies when the insured failed to comply with the ordinance before the collapse.

Other cases illustrate the proper operation of the OL provision. See, for example, *Regents of Mercersburg College v. Republic Franklin Insurance*, 458 F.3d 159 (3d Cir. 2006). There, a dormitory that was over a century old was struck by lightning, caught fire, and suffered immense damage. *Id.* at 161–62. Before the fire, the dormitory was excused from complying with the Americans with Disability Act (ADA) under an exception for older buildings. *Id.* at 162. But the ADA provides, "When a public accommodation or a part of it is altered, . . . 'the altered portions of the facility [must be made] readily accessible to and usable by individuals with disabilities . . . .'" *Id.* at 164–65 (quoting 42 U.S.C. § 12183(a) (2000)). Therefore, the upgrades required to comply with the ADA were covered by the OL provision. *Id.* at 169–70. Consider also *Cincinnati*

*Insurance v. Rymer Companies, LLC*, 41 F.4th 1026 (8th Cir. 2022). There, a mall roof was partially destroyed by a tornado. *Id.* at 1027. When inspectors surveyed the roof, they discovered the roof was in a "water soaked" condition. *Id.* at 1028. The OL clause in the insurance contract stated that "[i]f a Covered Cause of Loss occurs to a covered building or structure, resulting in the enforcement of an ordinance or law," then the insurance company will pay to "[r]econstruct or remodel undamaged portions of that building." *Id.* Local building codes did not mandate remediating water-soaked roofs immediately upon discovery. *Id.* at 1030. The building code did, however, forbid the repair of water-soaked roofs and, instead, required them to be fully replaced when altered. *Id.* Only when the tornado damage necessitated a partial roof repair did the code require replacement of the entire water-soaked roof. *Id.* As the Eighth Circuit recognized, "the roof did not violate § 1511.3.1.1 before the tornado." *Id.* at 1031 (distinguishing cases identified by the insurer as "includ[ing] an important fact missing here—pre-existing violations of the building code"). By contrast, WCSD was in violation of Waterloo building codes before the collapse.

WCSD relies heavily on *DEB Associates v. Greater New York Mutual Insurance*, 970 A.2d 1074 (N.J. Super. Ct. App. Div. 2009). In *DEB*, a windstorm sheared off the brick façade of an eight-story building, revealing that the walls were not properly secured to the concrete flooring with iron fasteners. *Id.* at 1075. A municipal code official inspected the building after the windstorm and determined that the walls of the entire building needed to be secured to the concrete flooring before the structure could be considered safe. *Id.* The building owner sought to recover under its property insurance contract, which contained a similar OL additional coverage clause. *Id.* at 1076. The policy excluded coverage for " 'loss due to any ordinance or law that [the insured was] required to comply

with before the loss, even if the building was undamaged' but the insured 'failed to comply with.' " *Id.* at n.2 (alteration in original).

The *DEB* court held that the undamaged portions of the building were covered by the OL additional coverage and that the exception did not apply. *Id.* at 1083. But its holding rested on facts not present here. First, years before the windstorm, the insured discovered the absence of iron fasteners in a different part of the building and installed them. *Id.* at 1075 n.1. "The local building inspector approved the work, but did not, at that time, require plaintiff to secure the walls to the floors throughout the rest of the building." *Id.* By contrast, no Waterloo building inspector gave WCSD a pass on the deteriorated mortar before the collapse. Second, the parties presented "no evidence that any then-applicable construction code required interior building walls to be secured with angle irons." *Id.* at 1076. The court therefore began its analysis by noting that the appeal did "not implicate" the exception to the OL coverage at issue here. *Id.* The *DEB* court ultimately determined that "the policy did not specifically exclude situations where, as here, a covered structure was grandfathered under the current code but lost its grandfathered status because of the occurrence of covered damage." *Id.* at 1083. That rationale is inapplicable here because the deterioration in Lowell Elementary School's load-bearing walls was not grandfathered under the city's building code before the roof collapse. The code violation defeats WCSD's position based on the plain language of the policy exception.

We hold that the district court correctly applied the OL exception to defeat WCSD's claim for the costs to replace deteriorated walls outside the area of the partial roof collapse. A contrary holding would drive up the cost of premiums to insure old buildings. WCSD purchased insurance protecting against risks of

weather damage, including this abrupt collapse caused by heavy snow. The EMC policy provides such coverage. But WCSD did not purchase OL coverage that included pre-existing code violations; providing such coverage would, as the district court recognized, turn the policy into a "general maintenance contract."

Because we resolve this appeal by affirming the district court's application of the OL exception, we do not reach the other grounds for denying coverage decided by the district court or urged by EMC.

**IV. Disposition.**

For the foregoing reasons, we affirm the district court's summary judgment for EMC.

**Affirmed.**

All justices concur except May, J., who takes no part.